**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

DONNA L. B..[1],
    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 2:24-cv-4292
Litkovitz, M.J.

**ORDER**

Plaintiff Donna L. B. brings this action under 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying her application for disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement of Errors (Doc. 10), the Commissioner's response in opposition (Doc. 11), and plaintiff's reply memorandum (Doc. 12).

**I. Procedural Background**

Plaintiff filed an application for DIB on October 12, 2021, alleging an onset of disability of December 30, 2018, due to "severe back pain, numbness in [her] legs, gastroparesis, and high blood pressure." (Tr. 48). Plaintiff was 53 years old as of her alleged onset date. (Tr. 242). She had at least a high school education (Tr. 234) and past relevant work as a dental assistant and retail store manager. (Tr. 35). The application was denied initially and upon reconsideration. Plaintiff, through a non-attorney representative, requested and was granted a *de novo* telephone hearing before administrative law judge (ALJ) Jeffrey Hartranft. Plaintiff and a vocational expert (VE) appeared and testified at the hearing on October 27, 2023. (Tr. 15-47). On November 27, 2023, the ALJ issued a decision, concluding that plaintiff was not disabled. (Tr.

---

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

70-85). This decision became the final decision of the Commissioner when the Appeals Council denied review on November 19, 2024. (Tr. 1-7).

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four

2

steps of the sequential evaluation process.  *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548

(6th Cir. 2004).  Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy.  *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

### B.  The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. [Plaintiff] meets the insured status requirements of the Social Security Act through March 31, 2024.
>
> 2. [Plaintiff] has not engaged in substantial gainful activity since December 30, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3. [Plaintiff] has the following severe impairments: degenerative disc disease of the lumbar spine with radiculopathy; ankylosing spondylitis of the lumbar spine; dextroscoliosis of the thoracic spine and levoscoliosis of the lumbar spine; chronic pain syndrome; gastroparesis with gastric pacemaker; gastroesophageal reflux disease (GERD); right knee arthritis with surgery; degenerative joint disease of the right shoulder; arthritis of the hips; hernia; and hypertension (20 CFR 404.1520(c)).
>
> 4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can stand and walk for four hours out of an eight hour work day and occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds.  She can occasionally balance, stoop, kneel, crouch, and crawl. She must avoid workplace hazards such as unprotected heights and machinery.
>
> 6. [Plaintiff] is  capable of performing past relevant work as a dental assistant and retail store manager.  This work does not require the performance of work-related activities precluded by her residual functional capacity (20 CFR 404.1565). Additionally and alternatively, she retains the residual functional capacity to

perform a significant number of other jobs in the national economy up to June 15, 2020, the date she attained age 55.[2]

7. [Plaintiff] has not been under a disability, as defined in the Social Security Act, from December 30, 2018, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 70-85).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill,* 587 U.S. 97 (2019) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails

---

[2] The vocational expert testified that plaintiff would be able to perform the requirements of representative occupations such as marker (DOT number 209.587-034) and routing clerk (DOT number 222.687-022). The identified positions are light, unskilled occupations with SVPs of two. The vocational expert testified there are approximately 68,391 marker jobs and 58,993 routing clerk jobs in the national economy that an individual with the plaintiff's vocational profile and residual functional capacity would be able to perform. (Tr. 36-37).

to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545–46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D.  Specific Errors

Plaintiff alleges the ALJ's RFC determination is not supported by substantial evidence for two reasons: (1) the ALJ improperly evaluated plaintiff's subjective complaints pursuant to SSR 16-3p and mischaracterized the record while ignoring a probative line of evidence that was consistent with plaintiff's subjective complaints; and (2) the ALJ failed to properly evaluate each of plaintiff's physical and mental medically determinable impairments at Step Two and failed to consider the combination of both severe and non-severe impairments.

The Commissioner counters that the ALJ properly evaluated the record as a whole, including plaintiff's testimony, the nature and extent of her treatment, the documented frequency of her symptoms, the normal examination findings of record, her reported activities, and the findings of the state agency physicians and psychologists.  The Commissioner asserts the ALJ identified inconsistencies between the plaintiff's subjective complaints and the evidence of record and properly evaluated plaintiff's impairments both individually and in combination in determining plaintiff's RFC for a reduced range of light work without mental limitations.

#### 1.  **The ALJ's symptom severity analysis is not supported by substantial evidence.**

ALJs must "consider all of the evidence in an individual's record" and determine whether the individual is disabled by examining "all of the individual's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective

5

medical evidence and other evidence in the individual's record." SSR 16-3p, 2016 WL 1119029, at *2.  ALJs also evaluate the "consistency" of a claimant's subjective description of symptoms with the record.  *See Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 n.3 (6th Cir. 2020) (citing *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016)).

A two-step inquiry applies to symptom evaluation.  The ALJ first determines if the record contains objective medical evidence of an underlying medically determinable impairment that could reasonably be expected to produce the individual's symptoms.  SSR 16-3p, 2016 WL 1119029, at *3; *see also* 20 C.F.R. § 404.1529(a); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003).  Step two of symptom evaluation shifts to the severity of a claimant's symptoms.  The ALJ must consider the intensity and persistence of the symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities.  *See* 20 C.F.R. §§ 404.1529(a) and (c); SSR16-3p, 2016 WL 1119029, at *4.  In making this determination, the ALJ will consider the following:

(i)      Your daily activities;

(ii)     The location, duration, frequency, and intensity of your pain or other symptoms;

(iii)    Precipitating and aggravating factors;

(iv)     The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v)      Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi)     Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii)    Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

An ALJ may not consider only objective medical evidence in determining disability unless this evidence alone supports a finding of disability.  SSR 16-3p, 2016 WL 1119029, at *5 ("If we cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then we carefully consider other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms."); 20 C.F.R. § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.").  Moreover,

> [i]t is . . . not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *9.  *See also id.* at *7 (noting that the ALJ "will discuss the factors pertinent to the evidence of record").  At the same time, the ALJ is not required to cite or discuss every factor used to evaluate the consistency of a plaintiff's description of symptoms with the record evidence.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

### a.  Plaintiff's testimony about gastroparesis and headaches.

Plaintiff testified that her gastroparesis causes her to experience periodic flare-ups.  (Tr. 26).  Her stomach's improper functioning leads to aspiration in her lungs.  (Tr. 27).  After eating, her stomach fails to work correctly, resulting in severe nausea upon waking on some days.  (Tr.

26).  She has required intubation on six occasions and has been hospitalized for aspiration pneumonia treatment.  (Tr. 27).  A gastric stimulator was implanted, which eliminated the need for tube feeding through her arm.  (Tr. 27).  Despite the stimulator, plaintiff continues to have days marked by severe symptoms.  (Tr. 27).  When experiencing a gastric flare, she feels intense nausea, occasionally vomits, and spends most of her time lying down.  (Tr. 33).

Plaintiff also testified she experiences migraines one to two times per month.  (Tr. 26). She characterized her headaches as incapacitating and indicated that on days when a headache occurs, she is unable to work because she must remain in bed.  (Tr. 26).  She takes preventative migraine medication and has attempted various prevention strategies, including injectable treatments.  (Tr. 26).  Despite the preventative medication, she still experiences breakthrough headaches.  (Tr. 27).  She has been given medication to address headaches, but it does not provide same-day relief.  (Tr. 34).  This condition has troubled her for years, though it has recently intensified.  (Tr. 27).  She testified that when a migraine occurs, she must lie in bed in a darkened room.  (Tr. 34).

### b.  The ALJ's evaluation of gastroparesis and headache evidence.

The ALJ recognized that plaintiff had a documented history of numerous healthcare visits for multiple impairments, including gastroparesis, epigastric discomfort, and constipation.  (Tr. 78).  The ALJ acknowledged plaintiff's testimony about migraines, but he stated that plaintiff attributed them to hypertension.  (Tr. 73).  In addition, the ALJ found no severe migraine headache impairment, finding the record does not document significant, ongoing complaints regarding headaches that would suggest that they are as intense or as severe as alleged.  (Tr. 73).

In reviewing the record evidence, the ALJ determined that despite some objective findings related to plaintiff's other conditions, progress notes related to her physical impairments

8

showed plaintiff routinely experienced no distress or no acute distress. (Tr. 78, citing numerous records). The ALJ noted that in April 2019, plaintiff had a non-functioning gastric electrical stimulator, and endoscopic and colonoscopic examinations revealed moderate bile in the stomach and mild gastritis without erosion. (Tr. 78-79, citing Tr. 342). The ALJ observed that the gastric pacemaker was replaced in May 2019 (Tr. 79, citing Tr. 646), and in August 2019, plaintiff reported her nausea went away almost immediately after the pacemaker was adjusted. (Tr. 79, citing Tr. 1072).

The ALJ noted that in June 2020, plaintiff's gastric pacemaker was working well, and she was sleeping fine. (Tr. 79, citing Tr. 1045). In September 2021, a CT scan of plaintiff's abdomen and pelvis showed normal findings except for elements of constipation; no abnormality was seen to clearly account for her symptoms. (Tr. 79, citing Tr. 2472). On May 3, 2022, plaintiff successfully underwent a fluoroscopic guided lumbar epidural blood patch procedure to address severe spinal headaches, but according to the ALJ, the record is otherwise relatively silent regarding headaches. (Tr. 80, citing Tr. 2969). The ALJ noted that a May 19, 2022 exam showed plaintiff was in no acute distress; she was able to ambulate; and her abdomen was distended and diffusely tender with no peritoneal signs. (Tr. 79, citing Tr. 2634).

The ALJ noted that in April 2023, plaintiff experienced aspiration pneumonia secondary to emesis from gastroparesis, with no documentation of continuing findings on exams or further pulmonary function testing. (Tr. 80, citing Tr. 3272-72, Tr. 3781-4000, and Tr. 4001-4052). Finally, an August 2023 nuclear medicine gastric emptying test revealed rapid gastric emptying. (Tr. 80, citing Tr. 3234-3235).

The ALJ found plaintiff's subjective allegations of her symptoms were inconsistent with the record evidence:

As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because, though she had musculoskeletal conditions, her pain has been reasonably well controlled with pain medication and injections, with exams revealing her to mostly be in no distress or no acute distress. She testified that on her normal days she is able to be on her feet for four hours and has no problems sitting. *She does get flares, but the frequency is not well documented and they are not all going to be on work days. Likewise, the alleged severity and frequency of her headaches is not supported by the record. Her gastroparesis seems to be controlled with her pacemaker as testing showed rapid gastric emptying* (Ex. 14F). She reported and testified to craftwork and frequent reading with no apparent difficulty caused by pain, and she is able to live alone, drive, pay bills, prepare simple meals, and handle stress and changes in routine, as summarized in Finding 3 above. In summary, the location, duration, frequency, and intensity of her alleged symptoms, as well as precipitating and aggravating factors, are adequately addressed and accommodated in the above residual functional capacity.

(Tr. 83) (emphasis added).

Plaintiff contends the ALJ failed to evaluate the intensity, persistence, and limiting effects, including flare ups, of plaintiff's gastroparesis and migraine headache symptoms which are work-preclusive. Plaintiff alleges the normal test results and physical examination findings cited by the ALJ (*see* Tr. 78) are not relevant to whether the frequency and intensity of her headache and gastroparesis flareups preclude work activity. Plaintiff also alleges the ALJ mischaracterized the treatment notes and ignored contrary lines of evidence. (Doc. 10 at PAGEID 4150).

### c. Gastroparesis

The Court determines that the ALJ's evaluation of plaintiff's gastroparesis symptoms does not comport with SSR 16-3p, and his decision indicating the initial placement of plaintiff's gastric stimulator in 2010 (Tr. 342) and its later replacement in May 2019 (Tr. 646) eliminated or controlled plaintiff's symptoms is not supported by substantial evidence. Plaintiff points to evidence demonstrating ongoing symptomology and treatment despite the initial placement of the gastroparesis pacemaker device in 2010 and replacement in May 2019. (Doc. 10 at PAGEID

4151-4154).  The ALJ's decision omits consideration of significant evidence suggesting that flareups of this impairments, in conjunction with the limiting effects of plaintiff's other multiple impairments, could be work-preclusive.

For example, the ALJ acknowledged that in April 2019, plaintiff's gastric electrical stimulator was not functioning; that the device was replaced in May 2019; and that in August 2019, treatment notes showed the device was adjusted and plaintiff's "nausea went away almost immediately," suggesting that plaintiff's complaints were not consistent with the evidence.  (Tr. 79, citing Tr. 1242).  The additional evidence cited by plaintiff, however, indicates her symptoms were not well-controlled:

> • April 1, 2019: Plaintiff reported experiencing nausea every day and occasional vomiting. (Tr. 885).

> • April 15, 2019: Plaintiff received medical care for "poorly controlled gastroparesis" accompanied by nausea and vomiting.  (Tr. 544).  An endoscopic procedure revealed "scattered food deposits"  present throughout her esophagus.  (Tr. 545).

> • April 20, 2019:  Dr. Sirisha Grandhe examined plaintiff's endoscopic and colonoscopic findings. (Tr. 489).  Dr. Grandhe concluded that plaintiff's nausea and vomiting symptoms were most likely attributable to inadequately controlled gastroparesis.  (Tr. 489).  He recommended plaintiff continue PPI[3] and Zantac (for contribution of bile-induced gastritis) to help with plaintiff's symptoms.  He noted plaintiff's "pacemaker will also need to be exchanged whenever next available (per Surgery)." (Tr. 489).

> August 15, 2019: Despite replacement of the gastric pacemaker in May 2019, treatment notes show plaintiff was hospitalized from August 5 to August 13, 2019 for multifocal pneumonia with her third intubation in a year.  She experienced aspiration pneumonia of both lungs due to gastric secretions.  (Tr. 1256-1257).  She also received a prescription for a hospital bed to help avoid repeated episodes of aspiration pneumonia resulting from gastric secretions.  (Tr. 1258).

> August 30, 2019: Plaintiff reported persistent abdominal pain stemming from gastroparesis.  (Tr. 1247).

---

[3] PPI or proton pump inhibitors are medications that reduce stomach acid.

11

The ALJ's decision fails to acknowledge plaintiff's persistent complaints of pain from gastroparesis or her eight-day hospitalization from aspiration pneumonia, strongly suggesting this impairment was not under control despite replacement of her gastric pacemaker.

Similarly, the ALJ's decision reflects that on June 9, 2020, plaintiff's "gastric pacemaker was working well" and "she was sleeping fine." (Tr. 79, citing Tr. 1045). However, the ALJ fails to recognize that less than one week later, plaintiff presented to the emergency department with abdominal pain, nausea, and vomiting. (Tr. 1331). The diagnosis was acute abdominal pain and an acute exacerbation of gastroparesis. (Tr. 1337).

The ALJ cites to a single record in 2021 concerning plaintiff's gastroparesis: a September 30, 2021 CT scan of plaintiff's abdomen and pelvis showed "normal findings except for an element of constipation, with no abnormality seen to clearly account for her symptoms." (Tr. 79, citing Tr. 2472). The ALJ's decision fails to account for the following 2021 evidence:

• January 19, 2021: A medical provider documented plaintiff's ongoing nausea and vomiting and chronic abdominal pain. (Tr. 949-50). Plaintiff was evaluated for gastroparesis, diarrhea, and rectal bleeding and instructed to maintain her anti-nausea medication regimen. (Tr. 950).

• March 2, 2021: Plaintiff's healthcare provider documented persistent nausea and her use of Zofran for symptom management. (Tr. 2853).

• August 3, 2021: Plaintiff received treatment for swallowing difficulties and reported that specific foods became lodged in her upper esophagus. (Tr. 3051). Her gastrointestinal medications were modified, and she was directed to continue taking promethazine for nausea control. (Tr. 3051).

• September 1, 2021: A barium swallow study was conducted. (Tr. 3055). Results indicated that plaintiff experienced "pooling the recesses with virtually every swallow," likely caused by inflammation from acid reflux. (Tr. 3055). Barium was also observed in the left colon roughly two weeks after the esophagram, demonstrating "significant slowing of the entire gut given what was seen in the proximal duodenum on the esophagram." (Tr. 3055).

The ALJ cites to a May 2022 exam showing plaintiff in "no acute distress" "though her abdomen was distended and diffusely tender, but with no peritoneal signs." (Tr. 79, citing Tr. 2634). What the ALJ fails to mention, however, is that this examination was part of an emergency department visit for nausea, vomiting, abdominal pain, and constipation (Tr. 2631-2635, 2644), for which plaintiff was subsequently hospitalized for two days and received medical treatment. (Tr. 2650).

The ALJ's decision also cites to a May 2023 pulmonary function test suggesting "moderate mixed obstructive and restrictive ventilatory impairment significant small airway disease." (Tr. 80, citing Tr. 3259). The ALJ qualifies this finding by noting "this was in the context of recent aspiration pneumonia secondary to emesis from gastroparesis in April 2023 with no documentation of continuing findings on exams or further pulmonary function testing." (Tr. 80, citing Tr. 3272-72, Tr. 3781-4000, and Tr. 4001-4052). While the ALJ correctly notes that plaintiff experienced "recent aspiration pneumonia" the month before pulmonary function testing, he fails to acknowledge that the "recent aspiration pneumonia" was part of an *eleven-day* hospitalization. Plaintiff was hospitalized, intubated for at least two days, and treated for aspiration pneumonia secondary to emesis from gastroparesis from April 6 to April 17, 2023. (Tr. 3271-3285, 3910). She also reported an additional episode of aspiration the week prior to her hospitalization. (Tr. 3267). Following her eleven-day hospitalization, a hospital bed was recommended on discharge to help avoid recurrent episodes of aspiration. (Tr. 3285). This evidence does not support the ALJ's finding that plaintiff's gastroparesis "seems to be controlled." (Tr. 83).

Additionally, at plaintiff's April 5, 2023 consultative examination with Dr. Rohn T. Kennington (Tr. 3661-3668), she described continuing gastroparesis symptoms despite using

13

medication and having a medical device implanted. (Tr. 3661). Dr. Kennington's diagnoses included gastroparesis and migraine headaches, among other conditions (Tr. 3663), which the ALJ does not appear to acknowledge. (Tr. 80). In May 2023, plaintiff was seen by a pulmonary physician for follow up after her hospitalization for aspiration pneumonia. (Tr. 3817, 3820). Progress notes indicate GERD contributed to her recurrent symptoms, and aspiration precautions were recommended. (Tr. 3820). In June 2023, plaintiff met with her primary care physician for a follow up to her hospitalization for aspiration pneumonia. (Tr. 3252; *see also* Tr. 3271-3344). She reported "occasional nausea and bloating." (Tr. 3252). She was ordered to undergo another gastric emptying study and was given a new medication prescription. (Tr. 3256). The gastric emptying test showed rapid gastric emptying. (Tr. 2783).

The evidence plaintiff cites — which the ALJ appears to have ignored — supports her testimony about gastroparesis flare-ups. When combined with her numerous other impairments, the frequency and severity of these flare-ups, including multiple hospitalizations and intubations, could prevent her from working. Moreover, the ALJ's suggestion that plaintiff's gastroparesis symptoms seem to be controlled with her pacemaker as evidenced by "testing showing rapid gastric emptying" on one occasion (Tr. 83) fails to account for the episodic nature of plaintiff's condition, the symptoms of which wax and wane with periods of flare-ups. *See Sharp v. Barnhart*, 152 F. App'x 503, 509 (6th Cir. 2005) (in evaluating an episodic disease, consideration should be given to the frequency and duration of the disease's exacerbations, the length of the remission and the evidence of any permanent disabilities).

The ALJ's decision must say enough "to allow the [ ] court to trace the path of his reasoning." *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (quoting *Diaz v. Chater,* 55 F.3d 300, 307 (7th Cir. 1995)). Here, the ALJ's decision lacks a cogent

14

explanation as to why plaintiff's testimony about her flare ups and debilitating symptoms from gastroparesis are inconsistent with the record evidence.  Thus, the Court is unable to conclude that the evidence cited by the ALJ substantially supports his decision.  This matter must be remanded for further proceedings to reevaluate plaintiff's subjective allegations concerning her gastroparesis impairment.

### d.  Headaches

The ALJ determined that plaintiff's headaches do not constitute a severe impairment. The ALJ's decision states, "At the hearing, the claimant testified to migraines, but the record indicates that she attributed them to hypertension (Exs. 8F[4] and 22F[5]), and the record, as summarized in Finding 5 below, does not document significant, ongoing complaints regarding headaches that would suggest that they are as intense or as severe as alleged."  (Tr. 73).  The ALJ acknowledged that in May 2022, plaintiff received a lumbar epidurogram to treat spinal headaches.  (Tr. 80, citing Ex. 12F/71 (Tr. 2969)).  The ALJ stated that the record, however, "is otherwise relatively silent regarding headaches."  (Tr. 80).

Plaintiff cites the following records to support her claim that migraine headaches are a consistent and ongoing problem:

• March 15, 2019: Plaintiff was positive for migraine headache and prescribed Imitrex (Tr. 605).

• April 15, 2019:  Plaintiff reported frequent headaches (Tr. 2149).[6]

---

[4] Plaintiff presented on January 23, 2021 for migraine headache without photophobia, nausea or vomiting. She described the pain as throbbing and achy without radiation and  moderate in severity.  "[S]he thinks it is due to her blood pressure" and "[s]he takes arthritis medication and the headache goes away."  (Tr. 2445).  She was advised to "continue with [T]ylenol as needed."  (Tr. 2448).

[5] Exhibit 22F contains office treatment records from March 21, 2023 to August 28, 2023, but they do not attribute plaintiff's headaches to high blood pressure.

[6] Plaintiff's brief alleges she reported ongoing monthly headaches on May 24, 2021, July 29, 2021, and November 4, 2021.  (Doc. 12 at PAGEID 4181, citing Tr. 1081, 2821).  The Court's review of these records, however, reveals no indication that plaintiff reported experiencing headaches on a monthly basis.  Instead, the

15

• January 23, 2021: Plaintiff complained of a migraine headache (Tr. 2445) and was advised to continue with Tylenol as needed (Tr. 2448).

• July 23, 2021: Plaintiff sought medical attention for swelling in her legs and a "mild" headache (Tr. 3040).

• May 3, 2022: Plaintiff underwent a successful fluoroscopic guided lumbar epidural blood batch due to severe spinal headaches (Tr. 2969).

• March 21, 2023: Plaintiff and her medical provider discussed medications for headaches (Tr. 3644). The progress note states plaintiff "has had tension HA's [headaches] for a long time," with some photophobia requiring her to go to bed to help with her symptoms (Tr. 3647). She was prescribed Nurtec, a medication to treat and prevent migraine headaches (Tr. 3648).

• April 5, 2023: Dr. Kennington diagnosed migraine headaches (Tr. 3663).

• April 6, 2023: Plaintiff received a "migraine cocktail" during hospital treatment for headache complaints (Tr. 3271).

The Court concludes the ALJ's assessment of plaintiff's headache impairment is supported by substantial evidence. The evidence plaintiff cites shows she complained about and/or received treatment for headaches on seven occasions over four years. While plaintiff's medical records consistently reflect notations of a history of "chronic headache disorder" and/or a past medical history of "daily stress headaches" or migraine headaches (*See, e.g.*, Tr. 1080, 2429, 2434, 2440, 2455, 2821, 3415, 3419, 3423, 3437, 3448, 3450, 3469, 3478), these records do not reflect active treatment for uncontrolled migraine headaches. Moreover, many of the records reflect plaintiff denied experiencing headaches at the time of examination. (*See, e.g.*, Tr. 3469, 3478, 3415, 3423, 3437, 348, 3450). In view of the record evidence showing plaintiff received only sporadic treatment for her headaches, the ALJ reasonably determined that plaintiff's complaints of debilitating migraine headaches one to two times per month were not

---

records reflect a past medical history of headaches or a chronic headache disorder, with no evidence of treatment for headaches on the relevant dates.

supported by the record.  Plaintiff's contention in essence invites the Court to impermissibly reweigh the evidence before the ALJ.  *See Whetsel v. Comm'r of Soc. Sec.*, No. 2:15-cv-3015, 2017 WL 443499, at *8 (S.D. Ohio Feb. 2, 2017) ("[T]he Court is charged with determining the sufficiency of the evidence, not its weight.") (quoting *Thomas v. Comm'r of Soc. Sec.*, 2014 WL 2114567, *16 (N.D. Ohio May 20, 2014)) (Report and Recommendation), *adopted*, 2017 WL 1034583 (S.D. Ohio Mar. 16, 2017).  The Court finds no error in this regard.

### 2.  The ALJ evaluation of plaintiff's physical and mental impairments in combination is supported by substantial evidence.

Plaintiff argues the ALJ erred when he failed to consider the combined effect of plaintiff's severe and nonsevere impairments when formulating plaintiff's RFC.  Specifically, plaintiff argues that although the ALJ found her mental impairments — affective and anxiety-related disorders — to be nonsevere, he nonetheless failed to account for those impairments in combination with her other impairments when assessing her RFC.  Plaintiff alleges that "[b]eyond Step Two, there is simply no discussion in the written decision explaining why the nonsevere impairments did not merit any further limitations."  (Doc. 10 at PAGEID 4157, citing Tr. 77-85).

The ALJ stated that he "considered all of [plaintiff's] medically determinable impairments, including those that are not severe, when assessing her residual functional capacity."  (Tr. 73).  With respect to plaintiff's mental health impairments, the ALJ explained:

> [Plaintiff's] medically determinable mental impairments of affective and anxiety-related disorders, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore non-severe.  In making this finding, I have considered the broad functional areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1).  These four broad functional areas are known as the "paragraph B" criteria.

17

(Tr. 73).  The ALJ went on to examine, in detail, the functional areas of understanding, remembering or applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself.  (Tr. 73-76).  The ALJ reviewed the assessments of State Agency reviewing psychologist Karla Delcour, Ph.D., and Irma Johnston, Psy.D.; the medical evidence of record from 2018 through 2023; the consultative examination of psychologist Taylor Groneck, Psy.D.; and plaintiff's self-reported activities of daily living.  (Tr. 73-76).  The ALJ concluded that plaintiff had no limitation in understanding, remembering or applying information (Tr. 73-74); no limitation in interacting with others (Tr. 74); mild limitation in concentrating, persisting or maintaining pace (Tr. 74-75); and mild limitation in adapting or managing oneself (Tr. 75-76).  The ALJ stated that he "considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing her residual functional capacity."  (Tr. 73).

Plaintiff does not address the ALJ's findings on the paragraph B criteria or contend they are not supported by substantial evidence.  Rather, she contends the ALJ fails to mention any mental impairments or the effect of such impairments later in his decision or evaluate any mental impairments at Step Three (the Listings).  (Doc. 10 at PAGEID 4156).

The Court finds no error in these regards.  The ALJ's thorough discussion of the four paragraph B functional areas in connection with Step Two provides a substantial basis for his Listing finding that plaintiff's "impairments, both severe and non-severe, when considered either singly or in combination, do not meet or equal the level of severity described in the Listings of Impairments in Appendix 1 to Subpart P of Regulations No. 4."  (Tr. 76).  There was no need for the ALJ to repeat his Step 2 paragraph B analysis and findings in connection with his analysis of Step Three of the process when mental impairment findings of "no limitation" or "mild

18

limitation" clearly meant the 12.00 Listings were not met. *See Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). To the extent plaintiff argues the ALJ's findings on the combination of impairments are conclusory, plaintiff has not shown any error. "An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet" a listed impairment. *Loy v. Sec'y of Health & Human Servs.,* 901 F.2d 1306, 1310 (6th Cir. 1990). *See also Hill v. Commissioner of Social Sec.,* 560 F. App'x 547, 551 (6th Cir. 2014).

Plaintiff also argues the ALJ failed to consider the combination of impairments, including her mental health impairments, when formulating her RFC. In assessing an individual's RFC, the ALJ must consider all of an individual's medically determinable impairments, both individually and in combination. *See* SSR 96-8p, 1996 WL 374184, *7. When determining an RFC, the ALJ must "consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 WL 374184, at *5; *see also* 20 C.F.R. § 404.1545(e) (noting that the Commissioner will consider all of a claimant's medically determinable impairments, even if they are not severe).

Here, the ALJ's decision reflects consideration of plaintiff's severe and nonsevere impairments in evaluating plaintiff's RFC. The ALJ considered the findings of psychologists Dr. Delcour and Dr. Johnston, who assessed no limitation or only mild limitation in the four relevant mental work-related functional domains "as discussed under Finding 3 above." (Tr. 82). The ALJ also discussed the consultative assessment of Dr. Groneck, who "did not indicate any significant mental work-related limitations associated with the claimant's mental functioning" as "summarized in Finding 3 above." (Tr. 82). The ALJ further considered plaintiff's complaints

19

of mental health symptoms (Tr. 77) and her activities of daily living (Tr. 83). While the ALJ did not incorporate mental limitations in the RFC, the ALJ is not required to do so when the evidence supports a finding of no more than mild limitations in all levels of functioning. *See Heather M. v. Comm'r of Soc. Sec. Admin.*, No. 2:24-cv-1108, 2025 WL 313936, at \*4 (S.D. Ohio Jan. 28, 2025) (Report and Recommendation), *adopted*, 2025 WL 520855 (S.D. Ohio Feb. 18, 2025); *White v. Comm'r of Soc. Sec.*, No. 2:17-CV-1063, 2018 WL 5303060, at \*5 (S.D. Ohio Oct. 25, 2018) (Report and Recommendation), *adopted,* 2018 WL 6271593 (S.D. Ohio Nov. 30, 2018) ("the ALJ's determination that she had mild impairment does not *require* inclusion of mental limitations in the RFC") (and cases cited therein). Plaintiff fails to cite any record evidence that calls into question the ALJ's decision to not include specific limitations in the RFC based on plaintiff's mental impairments. *See O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (plaintiff "bears the burden of demonstrating a RFC more restrictive than that determined by the ALJ") (citing *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008)). Thus, plaintiff's second assignment of error is overruled.

**III. This matter is reversed and remanded for further proceedings.**

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the undersigned notes that all essential factual issues have not been resolved in this matter. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Therefore, this matter is reversed and remanded for further proceedings. On remand, the ALJ must reevaluate plaintiff's subjective allegations concerning her gastroparesis impairment and reassess plaintiff's symptom severity and RFC and obtain additional medical and vocational evidence as warranted.

Plaintiff's Statement of Errors (Doc. 10) is **SUSTAINED in part and OVERRULED in**

20

**part.**  The Court **REVERSES** the Commissioner's non-disability finding and **REMANDS** this

case to the Commissioner and Administrative Law Judge under Sentence Four of § 405(g) for

further proceedings consistent with this opinion.

 **IT IS SO ORDERED.**

_____
Karen L. Litkovitz
United States Magistrate Judge